# United States Court of Appeals
## For the First Circuit

Nos. 03-2352
     03-2551

LOCAL UNION NO. 12004, UNITED STEELWORKERS OF AMERICA; STEPHEN T.
  BRADLEY; GARY S. BUMA; PAUL P. EDMONDS; CHARLES H. GRANT, JR.;
  RAYMOND LAHAIR, JR.; CHARLES McNEIL; RONALD F. MEZZANO; THOMAS
                NUGENT; and THOMAS ST. PIERRE,

            Plaintiffs, Appellants / Cross-Appellees,

                              v.

 COMMONWEALTH OF MASSACHUSETTS, MASSACHUSETTS COMMISSION AGAINST
       DISCRIMINATION; DORCA I. GOMEZ, Commissioner for the
   Massachusetts Commission Against Discrimination; WALTER J.
   SULLIVAN, JR., Commissioner for the Massachusetts Commission
 Against Discrimination; and CYNTHIA A. TUCKER, Commissioner for
      the Massachusetts Commission Against Discrimination,

                     Defendants, Appellees,

                     PETER D. McGRATH,

             Defendant, Appellee / Cross-Appellant.

            APPEALS FROM THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MASSACHUSETTS

           [Hon. Nancy Gertner, U.S. District Judge]

                            Before

                  Selya, Circuit Judge,
             Porfilio,* Senior Circuit Judge,
                and Lynch, Circuit Judge.

---

     * Of the Court of Appeals for the Tenth Circuit, sitting by
designation.

Rudolph Milasich, with whom Harold L. Lichten, Terence E. Coles, and Pyle, Rome, Lichten & Ehrenberg, P.C. were on brief, for appellants/cross-appellees.

Robert L. Quinan, Jr., Assistant Attorney General, with whom Thomas F. Reilly, Attorney General, was on brief, for the Massachusetts appellees.

Donald C. Keavany, Jr., with whom Christopher, Hays, Wojcik & Mavricos was on brief, for appellee/cross-appellant McGrath.

Michele Granda, Charles P. Wagner, and Charles P. Wagner & Assocs. were on brief for amici curiae Gay & Lesbian Advocates & Defenders (GLAD) and the Massachusetts Lesbian & Gay Bar Association.

July 30, 2004

**LYNCH**, **Circuit Judge**.  A labor union and several of its individual members (the Union) seek declaratory and injunctive relief against the Massachusetts Commission Against Discrimination (MCAD) to prevent the MCAD from adjudicating a charge of discrimination by a supervisor against the Union that arose out of a labor dispute.  The sole basis for the Union's federal complaint is its contention that the MCAD proceeding is preempted by federal labor law under San Diego Building Trades Council v. Garmon, 359 U.S. 236 (1959), and related doctrines.  The district court dismissed the complaint for lack of subject-matter jurisdiction. We reverse and remand for further proceedings consistent with this opinion.

### I.

For purposes of this appeal, we accept as true the well-pleaded factual allegations in the Union's complaint and draw all reasonable inferences from those allegations in its favor.  Soto-Negron v. Taber Partners I, 339 F.3d 35, 38 (1st Cir. 2003).  Where the federal complaint is silent, additional details are drawn from the allegations in the verified complaint filed with the MCAD.

The incidents underlying this case occurred in April 1996, when Commonwealth Gas Company (ComGas) was embroiled in a bitter labor dispute.  Local Union No. 12004 of the United Steelworkers of America, AFL-CIO (Local 12004), was negotiating a

successor collective bargaining agreement on behalf of its members, who are a "bargaining unit" of production and clerical employees.

On April 1, 1996, when the previous collective bargaining contract expired, ComGas ordered a lockout of all employees who were members of Local 12004. Local 12004 responded with a concerted picketing campaign against the company. In addition to picketing at ComGas facilities, Local 12004 sent some of its members to set up picket lines at off-site areas where crews composed of ComGas supervisors and contractors were performing work ordinarily done by Local 12004 members. The purpose of these worksite picket lines was "to convince the[] supervisors and contractors not to perform work and services for ComGas that were considered to be bargaining unit work."

One of the ComGas supervisors assigned to perform this bargaining-unit work was Peter McGrath. McGrath, who is gay, was ordinarily employed as a manager for commercial and industrial sales at the company's Southboro, Massachusetts headquarters. Shortly after the lockout began, ComGas instructed McGrath to assist a distribution crew in Worcester, Massachusetts. The distribution crew was charged with investigating and repairing underground gas leaks in the Worcester area, work normally done by Local 12004 members.

When McGrath's crew started this work, Local 12004 members followed the crew and picketed its worksites. The picket

lines were rowdy and vulgar.  The Union's complaint candidly describes the pickets' behavior:  "The locked out employees would comment on how fat the scabs were, their lack of intelligence, what kinds of families they must have come from, their lack of sexual prowess, and their sexual orientation."  All of this, according to the Union, was calculated to persuade the distribution crew, including McGrath, not to perform bargaining-unit work during the lockout.

On May 7, 1996, McGrath filed an action in Massachusetts Superior Court against the Local 12004 members who had shouted sexually derogatory comments at him, asserting both Massachusetts common law and statutory claims.  According to the Union, ComGas funded McGrath's state lawsuit and even provided an attorney to represent him.  Approximately one month later, McGrath filed a verified complaint against the same Local 12004 members in the MCAD alleging discrimination on the basis of sexual orientation. Unusually, the literal terms of the Massachusetts employment discrimination statute appear to extend to discrimination by lower-ranked union employees against a supervisor in this context.[1]

---

[1] The statute makes it unlawful "[f]or a labor organization, because of . . . sexual orientation . . . to discriminate in any way against . . . any individual employed by an employer."  Mass. Gen. Laws ch. 151B, § 4(2).  It is not immediately clear whether this prohibition also regulates the conduct of individual members of a labor organization.  But the statute also provides that it is unlawful "[f]or any person to coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right granted or protected by this chapter."  Id. § 4(4A).  Taken

The lockout ended on September 8, 1996, when ComGas and Local 12004 agreed to a new collective bargaining agreement. The pickets went back to work and McGrath was subjected to no further abuse or harassment. Nothing had yet happened in McGrath's state court litigation, and McGrath voluntarily dismissed that complaint. The voluntary dismissal, it seems, was part of a general settlement between ComGas and Local 12004 in which each side agreed to encourage its members to dismiss pending judicial complaints based on the dispute.

McGrath did not, however, withdraw his MCAD complaint. On the contrary, McGrath filed a new verified complaint with the MCAD in November 1996, this time including Local 12004 itself and one more individual member (Thomas Nugent) as additional respondents. The complaint alleged that Local 12004 members had subjected McGrath to a "continuing pattern of speech and behavior . . . which is intimidating, threatening and harassing, and which constitutes discrimination based on sex and sexual orientation." It further alleged that Local 12004's leadership was aware of the pickets' "unlawful" behavior and failed to take any action to prevent it. According to the Union, ComGas funded McGrath's MCAD

---

in conjunction with the right not to be discriminated against "in any way" by a union, this provision appears to prohibit individual acts of discrimination when they are performed by lower-level subordinates who are acting as agents of the union. This analysis is consistent with the MCAD's decision, which relied on Beaupre v. Smith, 50 Mass. App. Ct. 480, 491-92 (2000).

complaint despite the end of the lockout and continued to fund the litigation through 2000.

McGrath's two MCAD complaints describe in detail the verbal abuses to which he was subjected. Most were simply crude remarks on his sexual orientation.[2] However, several comments involved what McGrath says are false and potentially damaging assertions -- for example, "Hey, watch out, he's got AIDS, he has probably given half you guys AIDS by now," and "Look how small these guys are. You look like little boys. You and Pete [McGrath] should get together because he likes little boys." In addition, several of the comments involved physical threats. Some of these were only vaguely threatening, and may or may not have been intended as threats of violence (e.g., "Do you want some K-Y up that hole, sweetie?" or "I might like a piece of that ass myself").

Two incidents described in the MCAD complaints, however, involved apparently dangerous and threatening conduct. On April 7, 1996, several Local 12004 members allegedly chased McGrath in their vehicles for several miles. When they finally caught him, they banged on the side of McGrath's vehicle, pushed the side-view mirror into the window, and shouted threats that included "We will put you in a box" and "I will pull your mustache off, you faggot."

_____

[2] Examples include "faggot"; "Nice earring, faggot, do you have a lot more at home?"; "Look in the hole, two scabs and a fag"; "Nice ass, are you going to wear a speedo when you go to Provincetown this summer?"; and similar fare.

On another occasion, an unidentified Local 12004 member poured a liquid onto McGrath's back, causing a burning sensation.

The Union and its members say they filed a motion to dismiss the MCAD complaint on preemption grounds shortly after the complaints were filed. In any event, over two years later, on July 9, 1999, an investigating commissioner of the MCAD issued a probable cause finding[3] against the Union and ordered that the case proceed to a public hearing. The commissioner certified three questions to the full Commission for determination, including: "Is the complaint pre-empted by the National Labor Relations Act as interpreted in San Diego Building Trades Council v. Garmon, 359 U.S. 236 (1959)?"[4]

The full Commission answered the certified questions on December 11, 2001, holding that MCAD's jurisdiction to adjudicate McGrath's complaint was not preempted by Garmon. The Commission acknowledged that, under Garmon, states have no authority to regulate conduct that is arguably protected under § 7 or arguably

---

[3] Under MCAD procedure, the investigating commissioner must issue a probable cause finding "[i]f, after appropriate investigation, the Investigating Commissioner determines that there is sufficient evidence to support a finding of Probable Cause to credit the allegations of the complaint." Mass. Regs. Code tit. 804, § 1.15(7)(b). For these purposes, probable cause requires "sufficient evidence upon which a fact-finder could form a reasonable belief that it is more probable than not that the respondent committed an unlawful practice." Id. § 1.15(7)(a).

[4] The remaining two questions involved the Union's liability for harassing acts by its members and the personal liability of individual employees for harassment based on sexual orientation.

prohibited under § 8 of the National Labor Relations Act (NLRA). Cf. Garmon, 359 U.S. at 245-47. Nevertheless, the Commission held that McGrath's allegations of harassment and threats of violence implicated the Commonwealth's "compelling state interest in the maintenance of domestic peace," an interest that the Garmon Court recognized as a legitimate basis for state regulation. Cf. id. at 247. Further, the Commission held that it was not barred from considering the Union's less threatening verbal abuses of McGrath because, the Commission concluded, the NLRA does not protect racial, ethnic, or homophobic slurs. It also found that McGrath could not have complained about the conduct to the NLRB.[5] Lastly, the Commission concluded that McGrath's complaint stated a claim against Local 12004 itself because it provided a sufficient basis to conclude that the organization knew of its members' harassment of McGrath and, in effect, ratified their conduct. At present, the MCAD order has no preclusive effect.[6]

---

[5] As we explain in Part III, the MCAD's conclusions that the NLRA does not protect racial, ethnic or homophobic slurs and that McGrath could not have complained about some of the Union conduct are both flatly wrong.

[6] Because the MCAD proceeding has not reached final judgment, the Union is not presently blocked by the Massachusetts doctrine of collateral estoppel from relitigating the issue of Garmon preemption in federal court. See Martin v. Ring, 514 N.E.2d 663, 664 (Mass. 1987) (collateral estoppel requires, inter alia, a final judgment on the merits). Massachusetts courts do accord final decisions of the MCAD preclusive effect, however, so the ultimate outcome of the MCAD proceeding may well bind the Union in any subsequent federal court action. See Brunson v. Wall, 541 N.E.2d 338, 340-41 (Mass. 1989).

More than a year later, on February 27, 2003, having litigated the preemption question in the MCAD and lost, the Union filed this action in federal district court. The complaint named as defendants the MCAD, three MCAD commissioners, and Peter McGrath. The Union sought a declaratory judgment that the MCAD proceeding was preempted both under Garmon and under Lodge 76, International Association of Machinists v. Wisconsin Employment Relations Commission, 427 U.S. 132 (1976) (hereinafter Machinists), and an injunction prohibiting the Commission from taking further action on McGrath's complaint. It also asserted a right to injunctive relief for preemption under 42 U.S.C. § 1983. In response, McGrath moved to dismiss the case on Younger abstention grounds. Younger v. Harris, 401 U.S. 37 (1971). The Commonwealth of Massachusetts, on behalf of the MCAD and its commissioners, likewise moved to dismiss for lack of subject-matter jurisdiction or, in the alternative, for abstention under Younger.

On August 5, 2003, the district court held that it lacked subject-matter jurisdiction over the Union's complaint. It reasoned that the Union's preemption claims are inherently defensive and thus that, under the "well-pleaded complaint" rule, the case did not arise under the laws of the United States. Nevertheless, the court went on in dicta to offer the Union "reassurance" on the merits of its Garmon preemption argument, opining at length on the relationship between federal labor law and

state tort law and expressing "confiden[ce]" that the MCAD would take account of that relationship in adjudicating McGrath's complaint. The court did not address the question of <u>Younger</u> abstention.

The Union filed this appeal on September 22, 2003, approximately two weeks after the thirty-day period for filing an appeal had expired. <u>See</u> Fed. R. App. P. 4(a). On the Union's motion, the district court granted an extension of time to file. McGrath (but not the Commonwealth) cross-appeals the district court's decision to grant the extension.

**II.**

**A. Timeliness of Appeal**

Before addressing the district court's subject-matter jurisdiction, we must tend to our own. The timely filing of a notice of appeal is "mandatory and jurisdictional." <u>Browder</u> v. <u>Dir., Dep't of Corr.</u>, 434 U.S. 257, 264 (1978). Nevertheless, the district court may extend the deadline in limited circumstances upon a showing of "excusable neglect or good cause." Fed. R. App. P. 4(a)(5)(A)(ii); <u>Bennett</u> v. <u>City of Holyoke</u>, 362 F.3d 1, 4 (1st Cir. 2004).

In this case, the thirty-day period expired on September 8, 2003. On September 22, fourteen days later, the Union filed its notice of appeal and attached a motion for an extension of time. McGrath opposed the motion; the other defendants did not. The

-11-

district court granted it without comment. McGrath now cross-appeals the court's order allowing the plaintiffs to file late. We review a district court's decision to grant an extension of time under Rule 4(a)(5) for abuse of discretion. Bennett, 362 F.3d at 4.

The grant of the extension was within the discretionary power of the district court and was not abusive. According to the Union's Rule 4(a)(5) motion and the attached affidavit, the attorney who was responsible for preparing the notice of appeal was preoccupied by the need to care for his infant son, who was severely ill. Though counsel drafted the notice of appeal before the thirty-day period expired, he failed to file it. The attorney represented that he did not become aware of this error until September 18, 2003, ten days after the original deadline. McGrath says that these circumstances do not amount to "excusable neglect" because the plaintiffs were represented by multiple attorneys throughout the case and so the incapacity of one attorney should not have prevented a timely filing. There is some force to that argument, and the district court would not have abused its discretion if it had denied the Union's Rule 4(a)(5) motion on that basis. But the court opted to grant the motion instead, and given the relative brevity of the delay, the attorney's plausible and uncontested explanation for it, the absence of any discernible prejudice, and the fact that the Massachusetts defendants did not

oppose the motion, we conclude that the trial judge did not abuse her discretion by doing so. See id. at 5 (deferring to the district court's decision to grant an extension under Rule 4(a)(5)); United States v. Carson, 52 F.3d 1173, 1180 (2d Cir. 1995) (similar); Redfield v. Cont'l Cas. Corp., 818 F.2d 596, 604 & n.3 (7th Cir. 1987) (similar); see also 16A Wright, Miller, & Cooper, Federal Practice & Procedure § 3950.3 (3d ed. 2004) ("Whether to grant an extension rests largely in the discretion of the district court. If it finds excusable neglect or good cause and grants an extension, the court of appeals should not second-guess this determination and in this way defeat the appeal . . . .").

## B. Subject-Matter Jurisdiction

We turn to the question whether the Union's complaint triggered the subject-matter jurisdiction of the district court. Our review is de novo. Stewart v. Tupperware Corp., 356 F.3d 335, 337 (1st Cir. 2004). For the reasons that follow, we hold that the action arises under federal law for purposes of 28 U.S.C. § 1331 and thus that the district court did have subject-matter jurisdiction over the case.

### 1. Preemption Claims

Although styled as a complaint for declaratory judgment, the Union's complaint in fact seeks both declaratory and injunctive relief and, in Count II, asserts a claim directly under 42 U.S.C.

-13-

§ 1983. For our purposes, the label of declaratory or injunctive relief does not much matter. Though the declaratory judgment device reverses the formal positions of the parties, it does not alter the rules of federal jurisdiction. Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671 (1950). Accordingly, the rule in declaratory judgment actions is that "if, but for the availability of the declaratory judgment procedure, the federal claim would arise only as a defense to a state created action, jurisdiction is lacking." Franchise Tax Bd. v. Constr. Laborers Vacation Tr., 463 U.S. 1, 16 (1983) (quoting 10A Wright, Miller, & Kane, Federal Practice & Procedure § 2767 (2d ed. 1983)); see also Penobscot Nation v. Georgia-Pacific Corp., 254 F.3d 317, 321 (1st Cir. 2001); Playboy Enters., Inc. v. Pub. Serv. Comm'n, 906 F.2d 25, 30 (1st Cir. 1990). So we must determine whether the Union could assert its preemption claims in a direct action against one or more of the defendants (i.e., whether the claims could arise in a non-defensive posture in a non-declaratory action).

The district court dismissed the Union's complaint because it believed, erroneously, that the Union's preemption claims are inherently defensive. It is true that "[o]rdinarily federal pre-emption is raised as a defense to the allegations in a plaintiff's complaint." Caterpillar, Inc. v. Williams, 482 U.S. 386, 392 (1987) (emphasis added). In such cases, the preemption defense, even if valid, does not convert the action into one that

-14-

"arises under" federal law for purposes of § 1331.  "By unimpeachable authority, a suit . . . does not arise under an act of Congress or the Constitution of the United States because prohibited thereby."  Gully v. First Nat'l Bank, 299 U.S. 109, 116 (1936); see Beneficial Nat'l Bank v. Anderson, 539 U.S. 1, 6 (2003); Caterpillar, 482 U.S. at 393; Franchise Tax Bd., 463 U.S. at 12.

In many ways, this is simply an application of the "well-pleaded complaint rule."[7]  Under that rule, with rare exceptions, "a suit arises under the Constitution and laws of the United States only when the plaintiff's statement of his own cause of action shows that it is based upon those laws or that Constitution."  Beneficial Nat'l Bank, 539 U.S. at 6 (quoting Louisville & Nashville R.R. Co. v. Mottley, 211 U.S. 149, 152 (1908)); Penobscot Nation, 254 F.3d at 321-22.  Where a defendant raises preemption as a defense to a state-law cause of action, "[t]he most one can say is that a question of federal law is lurking in the background, just as farther in the background there lurks a question of

---

[7] At oral argument, the parties phrased their arguments in terms of whether the well-pleaded complaint rule "applies" to the Union's complaint.  That rubric is inapt:  the well-pleaded complaint rule is simply a rule for applying 28 U.S.C. § 1331.  It "applies" in every case in which subject-matter jurisdiction is asserted under that statute, both in actions originally filed in federal court and in those removed from state court.  See Franchise Tax Bd., 463 U.S. at 10 n.9.  The question in this case is not whether the rule applies but whether its requirements are satisfied.

constitutional law, the question of state power in our federal form of government."  Gully, 299 U.S. at 117.  For this reason, a defendant may not remove a state lawsuit to federal court by asserting a preemption defense, "even if both parties admit that the defense is the only question truly at issue in the case." Franchise Tax Bd., 463 U.S. at 14.  This principle is subject to a few exceptions not applicable here, notably the doctrine of "complete preemption."  See generally Beneficial Nat'l Bank, 539 U.S. at 6-8.

A claim that a state regulation is preempted by a federal statute, however, need not always arise as a defense when injunctive relief is sought against state officials.  See Franchise Tax Bd., 463 U.S. at 12 n.12.  A plaintiff may assert federal preemption as an affirmative cause of action to enjoin state officials from interfering with federal rights.  In that context, a claim of preemption -- though ultimately "defensive" in the sense that it seeks to prevent harms threatened by state officials -- does constitute a federal question under § 1331.  The Supreme Court expressly approved of such claims in a footnote in Shaw v. Delta Air Lines, Inc., 463 U.S. 85 (1983):

It is beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights. See Ex parte Young, 209 U.S. 123, 160-62 (1908).  A plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal

-16-

question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve.

Id. at 96 n.14; see also Franchise Tax Bd., 463 U.S. at 20 n.20. Since Shaw, the Supreme Court has decided a variety of cases that fit within this jurisdictional principle. See Sloss, Constitutional Remedies for Statutory Violations, 89 Iowa L. Rev. 355, 380 & n.141 (2004) (collecting cases).

Here, the district court relied not on Shaw but on Public Service Commission v. Wycoff Co., 344 U.S. 237 (1952). The two cases are admittedly difficult to reconcile. In Wycoff, the Supreme Court held that a declaratory judgment action against a state utility commission did not involve a justiciable controversy. Id. at 245. Though it declined to reach the question of statutory subject-matter jurisdiction, the Court added the following oft-quoted dictum:

> Where the complaint in an action for declaratory judgment seeks in essence to assert a defense to an impending or threatened state court action, it is the character of the threatened action, and not the defense, which will determine whether there is federal-question jurisdiction in the District Court.

Id. at 248 (emphasis added). This circuit has adhered to the Wycoff dictum in the past. See Nashoba Communications Ltd. P'ship No. 7 v. Town of Danvers, 893 F.2d 435, 437-38 (1st Cir. 1990); Colonial Penn Group, Inc. v. Colonial Deposit Co., 834 F.2d 229, 233 (1st Cir. 1987); Greenfield & Montague Transp. Area v. Donovan, 758 F.2d 22, 26-27 (1st Cir. 1985). We have also recognized the

-17-

tension between Wycoff and the Shaw footnote.  See Playboy Enters., 906 F.2d at 30 (noting that the Supreme Court in Shaw recognized jurisdiction over claims apparently precluded by Wycoff "[w]ithout explaining exactly why").

This history does not matter.  A recent Supreme Court case eliminates any doubt about the vitality of the Shaw footnote. In Verizon Maryland Inc. v. Public Service Commission, 535 U.S. 635 (2002), a telephone company sued a state public utility commission in federal court.  Id. at 640.  The complaint sought declaratory and injunctive relief against the commission, alleging that an order that the commission had issued against the company was preempted by federal law.  Id.  The court of appeals held that the company's complaint did not present a federal question under § 1331.  Id.  Citing Shaw, the Supreme Court reversed:

> We have no doubt that federal courts have jurisdiction under § 1331 to entertain such a suit.  Verizon seeks relief from the Commission's order "on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail," and its claim "thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve."

Id. at 642 (quoting Shaw, 463 U.S. at 96 n.14).

In light of Verizon, the district court in this case plainly had subject-matter jurisdiction over the Union's complaint. Like the plaintiff in Verizon, the Union has sued a state administrative agency for declaratory and injunctive relief, alleging that the agency has acted in a manner inconsistent with

-18-

federal law.  This is not merely the assertion of a federal issue that, but for the declaratory judgment device, would arise only as a defense to a state-law cause of action.  Verizon and Shaw make clear that in suits against state officials for declaratory and injunctive relief, a plaintiff may invoke the jurisdiction of the federal courts by asserting a claim of preemption, even absent an explicit statutory cause of action.[8]

### 2.  Section 1983

There is a further reason why the district court erred in dismissing the action.  The Union's complaint contains two separate counts:  Count I asserts a direct cause of action for preemption, and Count II asserts a cause of action for preemption under 42 U.S.C. § 1983.  The district court's decision did not address the § 1983 count.

Almost by definition, a claim under § 1983 arises under federal law and will support federal-question jurisdiction so long as it does not "clearly appear[] to be immaterial and made solely for the purpose of obtaining jurisdiction."  Bell v. Hood, 327 U.S. 678, 682-83 (1946); see Penobscot Nation, 254 F.3d at 322.  Of course, § 1983 does not itself confer substantive federal rights;

---

[8] See also Fallon, Meltzer, & Shapiro, Hart & Wechsler's The Federal Courts & The Federal System 903 (5th ed. 2003) ("While there may be some lack of harmony in the case law, the rule that there is an implied right of action to enjoin state or local regulation that is preempted by a federal statutory or constitutional provision -- and that such an action falls within the federal question jurisdiction -- is well-established.").

it simply provides a remedy for their deprivation.  See Chapman v. Houston Welfare Rights Org., 441 U.S. 600, 617-18 (1979).  So the Union's § 1983 claim will support jurisdiction in this case if it colorably asserts that the MCAD deprived the Union of a specific "right[], privilege[], or immunit[y] secured by the Constitution and laws."  42 U.S.C. § 1983.[9]

We conclude that it does.  The Supreme Court held in Golden State Transit Corp. v. City of Los Angeles (Golden State Transit II), 493 U.S. 103 (1989), that the Supremacy Clause is not itself a source of rights enforceable under § 1983.  See id. at 107.  Still, a plaintiff wishing to assert a claim of preemption may nevertheless invoke § 1983 if the allegedly preempting federal statute does create such a right.  See id. at 107 n.4; Playboy Enters., 906 F.2d at 32.  That test is readily satisfied here.  The Union alleges that the MCAD's adjudication of McGrath's complaint is preempted not only under Garmon but also under the Machinists

---

[9] The fact that the Union's § 1983 claim may support subject-matter jurisdiction, of course, does not mean that the relief sought in Count II is available.  In 1996, Congress amended 42 U.S.C. § 1983 to provide that "in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable."  Federal Courts Improvement Act of 1996, Pub. L. No. 104-317, § 309(c), 110 Stat. 3853.  Because there has been no prior declaratory decree in this case, the Union is not entitled to injunctive relief on its § 1983 claim against the MCAD commissioners.  But because the Union could in theory be entitled to declaratory relief, the § 1983 claim may still support federal jurisdiction.

-20-

doctrine, which recognizes that the NLRA specifically confers on employers and employees a right to be free from governmental regulation of the "peaceful methods of putting economic pressure on one another." Machinists, 427 U.S. at 154. Such a claim is not frivolous on the facts of this case, given that the MCAD has asserted jurisdiction to regulate the conduct of Union members picketing during a labor dispute. And in Golden State II, the Supreme Court held that the Machinists doctrine embodies a substantive right under the NLRA that Congress intended to be enforceable under § 1983. See 493 U.S. at 111-13; see also Livadas v. Bradshaw, 512 U.S. 107, 133-34 (1994).

Accordingly, because the Union's § 1983 claim is not "immaterial and made solely for the purpose of obtaining jurisdiction," Bell, 327 U.S. at 682-83, it is sufficient to confer federal-question jurisdiction under 28 U.S.C. § 1331.[10]

### III.

Having determined that the district court erred in dismissing the Union's complaint for lack of subject-matter jurisdiction, we must turn next to the question whether, under the doctrine of Younger, the district court should decline to exercise jurisdiction in deference to the ongoing MCAD proceedings. Because

---

[10] To be clear, we do not hold that the Union is entitled to prevail on its Machinists preemption claim. We simply hold that Count II of the Union's complaint asserts a non-frivolous claim for relief under 42 U.S.C. § 1983 and, consequently, is sufficient to support federal-question jurisdiction.

-21-

the district court found that it lacked subject-matter jurisdiction, it did not reach the issue of Younger abstention, though it did address the substantive question of preemption.[11]

Two different categories of exceptions to Younger are potentially involved here. The first is the exception for state court proceedings brought in bad faith. See Huffman v. Pursue, Ltd., 420 U.S. 592, 611-12 (1975). The second concerns the exceptions to Younger that arise out of the preemption doctrine and the strong national interest in the uniformity of labor laws. See New Orleans Public Service, Inc. v. City of New Orleans, 491 U.S. 350, 367 (1989) ("NOPSI"). As to the latter, the Younger analysis is in the end a question of who should decide whether there is some form of preemption by the federal labor laws: the state courts on review of any MCAD order, subject to review by certiorari in the Supreme Judicial Court, or the federal courts, which also have jurisdiction over the matter. We say "some form" of preemption because two types of preemption may be implicated by the MCAD proceedings. First, there is the more typical issue of whether federal substantive labor law conflicts with Massachusetts law concerning the legality of the Union's conduct. See, e.g., Golden

---

[11] Even if the district court had determined that it possessed subject-matter jurisdiction, that ordering of analysis would not be appropriate. Ordinarily, the Younger question must be decided before decision on the merits of the underlying claim. See Hicks v. Miranda, 422 U.S. 332, 346 (1975). The district court correctly perceived, though, that the Younger and preemption issues are related.

-22-

State Transit Corp. v. City of Los Angeles (Golden State I), 475 U.S. 608, 614 (1986). Second, there is the fundamentally different question of Garmon "forum preemption," which concerns whether both state and federal tribunals (including the MCAD) must "defer to the exclusive competence of the [NLRB]." Garmon, 359 U.S. at 245. There is no Supreme Court case directly on point as to the intersection between Younger and Garmon. The most analogous case from this circuit, Chaulk Servs., Inc. v. Mass. Comm'n Against Discrimination, 70 F.3d 1361 (1st Cir. 1995), found Younger abstention to be inappropriate in a similar, but not identical, situation. Id. at 1370. Potentially, though, there are significant differences between Chaulk Services and this case that may or may not require a different result here.

As all of this suggests, resolution of the Younger abstention question is extremely complicated. It turns on the interplay of several different doctrines, including Younger itself, the exception to Younger for "facially conclusive" preemption that is left open in NOPSI, and the doctrine of "forum preemption" established in Garmon. It also may well depend on the answer to several questions that have not been briefed by any of the parties and on information not available to us.

For these reasons, we remand the case for further proceedings on the question of Younger abstention rather than decide the issue on a blank slate. In the interests of providing

-23-

guidance to the parties and the district court, we frame the basic issues. At first blush, this case might seem an easy one for Younger abstention. Under the framework announced by the Supreme Court in Middlesex County Ethics Committee v. Garden State Bar Association, 457 U.S. 423 (1982), Younger abstention is ordinarily required if (1) there is an ongoing state judicial proceeding involving the federal plaintiff that (2) implicates important state interests and (3) provides an adequate opportunity for the federal plaintiff to assert his federal claims. See id. at 432; Brooks v. N.H. Supreme Court, 80 F.3d 633, 638 (1st Cir. 1996). The first and third requirements appear to be satisfied here; the second is tied into the analysis below. But there are several potentially applicable exceptions to Younger that frustrate any simple resolution of the issue.

First, abstention under Younger is not appropriate for prosecutions that are brought in bad faith. Huffman, 420 U.S. at 611 ("Younger . . . do[es] of course allow intervention in those cases where the District Court properly finds that the state proceeding is motivated by a desire to harass or is conducted in bad faith . . . ."). The Union has argued that McGrath's complaint with the MCAD meets the requirements for this exception. It claims that ComGas, which it says actively funded the suit through 2000, is using it as an "economic weapon . . . to harass the picketing union members and Local 12004" and to evade the requirements of the

-24-

NLRA. They say that the Supreme Court specifically warned against such behavior in <u>Linn</u> v. <u>United Plant Guard Workers</u>, 383 U.S. 53, 64 (1966). This argument is not a frivolous one; it is fundamentally fact-bound and should be decided upon in the first instance by the district court.

The second exception to <u>Younger</u> that may be applicable here is significantly more complicated, and involves <u>Younger</u>'s requirement that the state judicial proceeding implicate an important state interest. In <u>NOPSI</u>, the petitioner argued that <u>Younger</u> does not require abstention in the face of a "substantial" preemption claim because the state has no legitimate interest in conducting a preempted proceeding. 491 U.S. at 364. Although the Supreme Court rejected that argument, it left open the possibility that <u>Younger</u> abstention might not be appropriate when a claim of preemption is not merely "substantial" but "<u>facially conclusive</u>." <u>See</u> <u>id.</u> at 367 (emphasis in original). Since <u>NOPSI</u>, cases from both this circuit and other circuits have endorsed the existence of this "facially conclusive" preemption exception to <u>Younger</u>. <u>Midwestern Gas Transmission Co.</u> v. <u>McCarty</u>, 270 F.3d 536, 539 (7th Cir. 2001); <u>Communications Telesystems Int'l</u> v. <u>Cal. Pub. Util. Comm'n</u>, 196 F.3d 1011, 1017 (9th Cir. 1999); <u>Chaulk Servs.</u>, 70 F.3d at 1370.

The Union argues that this exception to <u>Younger</u> applies here because it is "facially conclusive" that the MCAD proceedings

were preempted, because all[12] of the conduct involved was "arguably protected" or "arguably prohibited."  It is not surprising that the Union focuses on <u>Garmon</u> "forum preemption," as it is the broadest form of preemption in this context.  Under <u>Garmon</u>, when conduct is either "arguably protected" by § 7 or "arguably prohibited" by § 8 of the NLRA, "the states as well as the federal courts must defer to the exclusive competence of the [NLRB] if the danger of state interference with national policy is to be averted."  359 U.S. at 244-45; <u>Sears, Roebuck & Co.</u> v. <u>San Diego County Dist. Council of Carpenters</u>, 436 U.S. 180, 221 (1978).  <u>Garmon</u> thus enforces Congress's choice to vest the NLRB with "primary jurisdiction" over conduct within the scope of the NLRA and thereby ensures a "uniform, nationwide body of labor law interpreted by a centralized expert agency."  <u>Tamburello</u> v. <u>Comm-Tract Corp.</u>, 67 F.3d 973, 976 (1st Cir. 1995).  The Supreme Court has explained that in the context of <u>Garmon</u> preemption, the term "primary jurisdiction" has a meaning different from its usual import in administrative law: when <u>Garmon</u> preemption applies, the state courts are <u>permanently</u> divested of jurisdiction over the controversy.  See <u>Sears, Roebuck</u>, 436 U.S. at 199 n.29.

---

[12] This overstates the matter.  For example, there may have been intentional and malicious defamation, which under <u>Linn</u> v. <u>United Plant Guard Workers</u>, 383 U.S. 53 (1966), the states may regulate.  <u>See</u> <u>id.</u> 63 ("The malicious utterance of defamatory statements in any form cannot be condoned, and unions should adopt procedures calculated to prevent such abuses.").

It is clear that much of the conduct at issue in the MCAD proceedings seems to be arguably protected or arguably prohibited under Garmon, and thus potentially to warrant an exception to Younger under NOPSI. Most notably, there is no question that the insults and epithets that union members directed towards McGrath while they were picketing are, at the very least, arguably protected by § 7 of the NLRA.[13] The NLRA clearly protects the right of picketing workers to use a variety of harsh and insulting speech -- including racial, ethnic, and homophobic slurs -- in furtherance of their § 7 right to engage in "concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. See, e.g., Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers, AFL-CIO v. Austin, 418 U.S. 264, 283 (1974) ("[F]ederal law gives a union license to use intemperate, abusive, or insulting language without fear of restraint or penalty if it believes such rhetoric to be an effective means to make its point."); Milk Wagon Drivers Union of Chi., Local 753 v. Meadowmoor Dairies, Inc., 312 U.S. 287, 293 (1941) (peaceful picketing is protected despite "moment[s] of animal exuberance"); Nat'l Council of Young Israel, 276 N.L.R.B.

_____

[13] The MCAD's December 2001 decision held that the NLRA does not protect "racial or ethnic slurs shouted by union members during a strike," and that likewise "there is no protection offered when the slurs are homophobic." As we explain, this holding gravely misstates federal law. Further, if such conduct were arguably prohibited by the NLRA, that too would support preemption.

1123, 1136 & n.14 (1985) (calling replacement workers "[n]iggers" was protected conduct under § 7); Ben Pekin Corp., 181 N.L.R.B. 1025, 1028 (1970) ("[O]ffensive, vulgar, defamatory, or opprobrious remarks uttered during the course of protected, concerted activities will not automatically destroy the right conferred by the Act to engage in conduct otherwise safeguarded by its text."). At the same time, it also may be "facially conclusive" that at least the alleged instances in which union members made credible threats of violence against McGrath are arguably prohibited by § 8 of the NLRA. See 29 U.S.C. § 158(b)(1)(A). See, e.g., NLRB v. Union Nacional de Trabajadores, 540 F.2d 1, 6-7 (1st Cir. 1976) (in dicta, observing that threats of physical harm by union members against employees who refused to participate in a strike would be prohibited under § 8 of the NLRA). Additionally, the Union's actions may have been arguably prohibited under § 8 of the NLRA because they took place in front of other bargaining-unit employees, who in turn might have been coerced into supporting the picket out of fear of being subjected to similar abuses. See Local No. 207, Int'l Ass'n of Bridge, Structural, & Ornamental Iron Workers Union v. Perko, 373 U.S. 701, 707 (1963); Union Nacional de Trabajadores, 540 F.2d at 6-7. If so, both ComGas and McGrath could have filed complaints with the NLRB.[14]

_____

[14] It is clear that McGrath or ComGas could have invoked NLRB jurisdiction (a fact pertinent to the bad faith allegation). The Commission held that McGrath "has no ability to bring a claim under

In a similar case, a divided panel of this Court held in Chaulk Services that abstention was not appropriate because the state MCAD proceedings were clearly preempted by federal law. In Chaulk Services, a labor union filed charges with the NLRB on behalf of a female labor organizer who claimed her employer had discriminated against her on the basis of her sex. 70 F.3d at 1363. While those NLRB charges were pending, the employee filed a discrimination charge against the company with the MCAD. When the MCAD refused to dismiss the proceeding as preempted under Garmon, the company sued in federal district court to enjoin the MCAD from adjudicating the complaint. Id. at 1363-64. The district court abstained under Younger. Id. at 1364. Citing NOPSI's exception for "facially conclusive" preemption claims, this court reversed,

_____

the NLRA." That is plainly incorrect, as counsel for the MCAD conceded at oral argument. NLRB regulations provide that "a charge that any person has engaged in or is engaging in any unfair labor practice affecting commerce may be made by any person." 29 C.F.R. § 102.9 (emphasis added). The regulations provide that the term "person" has the meaning set forth in section 2 of the NLRA. 29 U.S.C. § 152. The NLRA, in turn, defines person to "include[] one or more individuals, labor organizations, partnerships, associations, corporations, legal representatives, trustees, trustees in cases under title 11 of the United States Code, or receivers." Id. § 152(1)

At a minimum, both McGrath and ComGas had the right to file a charge with the NLRB that the Union's conduct was arguably prohibited under § 8 of the NLRA, id. § 158. See, e.g., Local No. 207, Int'l Ass'n of Bridge, Structural, & Ornamental Iron Workers Union v. Perko, 373 U.S. 701, 707 (1963) (claims of union misconduct toward a supervisor may be cognizable under the NLRB where such conduct would inevitably coerce non-supervisory employees).

-29-

concluding that "under the Garmon doctrine it is readily apparent that the Commission is acting beyond its jurisdictional authority by entertaining [the] complaint, for it is readily apparent that [the company's] conduct is at least arguably . . . subject to the NLRA." Id. at 1370 (internal quotation marks omitted).

But Chaulk Services is distinguishable from this case in at least one potentially important respect.[15] In explaining why Garmon preemption was "facially conclusive," the majority in Chaulk Services emphasized that when the MCAD assumed jurisdiction and began its investigations, there was already a pending NLRB proceeding based on the same incident. See id. at 1368-69. This case, by contrast, presents nearly the opposite circumstance: neither side has ever filed a complaint with the NLRB, and the Union now seeks an injunction against state proceedings that have been pending for more than eight years.

---

[15] In Chaulk Services the claimed offending conduct was sex discrimination, which is prohibited by Congress in Title VII in addition to being prohibited by state law, and so there was no obvious conflict between state and federal law. Thus, one might argue that Congress has a lesser interest in exclusive NLRB jurisdiction in that situation. See Chaulk Services, 70 F.3d at 1374-75 (Lynch, J., dissenting). Here, by contrast, Congress has not explicitly prohibited sexual orientation discrimination. Furthermore, unlike in Chaulk Services, the employment discrimination alleged here is not classic discrimination by an employer against an employee. Rather, it is discrimination by lower-level employees against a supervisor. It also took place during a strike and a lock-out, which has been a traditional area of federal regulation since enactment of the NLRA.

The import of this distinction turns largely on at what point, if ever, the Union had the ability to invoke the primary jurisdiction of the NLRB. If the Union chose for strategic reasons to argue the Garmon preemption point to the MCAD when it could have gone to the NLRB, then its claim that the federal court should not abstain under the facially conclusive preemption exception recognized in NOPSI is significantly weaker. Under Sears Roebuck, there is a strong argument that the rationale for Garmon preemption is less powerful when a party voluntarily chooses to forego the primary jurisdiction of the NLRB. See 436 U.S. at 202-03 (holding that "the primary-jurisdiction rationale does not provide a sufficient justification for pre-empting state jurisdiction over arguably protected conduct when the party who could have presented the protection issue to the Board has not done so and the other party to the dispute has no acceptable means of doing so" (emphasis in original)).

Still, we are uncertain when, if ever, the Union had the ability to invoke the primary jurisdiction of the NLRB. Even if during the strike itself the Union had not been able to initiate such proceedings on the ground that its conduct was protected, perhaps it could have gone to the NLRB after McGrath instituted the MCAD proceedings. The answers to these questions have not been briefed, and are potentially of significant relevance in determining whether Chaulk Services governs here. In any case, the

difficult issues involved in the <u>Younger</u> abstention question should be fully briefed and argued by the parties before they are resolved.

**IV.**

The extension of time to file an appeal is **<u>affirmed</u>**, the judgment of dismissal is **<u>reversed</u>**, and the case is **<u>remanded</u>** for further proceedings consistent with this opinion.  **<u>So ordered</u>**.